**ERIC S. FISH**
California State Bar No. 280992
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Eric_Fish@fd.org

Attorneys for Defendant

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> FRANCISCO MIRANDA-ESPINOZA, <br><br> Defendant. | CASE NO.: 19-CR-4609 <br><br> **Request for Bond Modification** <br><br> Hon. Bernard G. Skomal |

Francisco Miranda-Espinoza requests that this Court release him on a $10,000 bond secured by his own signature. He requests that the Court make the requested modification without a hearing due to the current public health emergency. This request is based on the fact that Mr. Miranda-Espinoza is only charged with a misdemeanor 1325 offense, that he has already served nearly a month more than the statutory maximum of six months for that charge, that the Court will not be able to hold a bench trial in the near future due to the coronavirus outbreak, that it is imperative to release him before the virus hits our local jails, and that he is not a flight risk.

### I.   Applicable Law

The Bail Reform Act instructs judges to release a defendant on their own recognizance, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the

safety of any other person or the community." 18 U.S.C. § 3142(b). For cases where a bond or other further condition is set, the Act instructs that it must be "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

## II. Mr. Miranda-Espinoza is only charged with a misdemeanor 1325 violation, and has served more than the maximum sentence

Mr. Miranda-Espinoza was arrested on August 30, 2019. In one week he will have served seven months in custody in this case. On March 10, 2020, Judge Sabraw tentatively granted Mr. Miranda-Espinoza's motion for dismissal of the felony 1326 charge, and the government immediately moved to dismiss that charge. Currently the only charge pending is a 1325 misdemeanor, for which the maximum possible sentence is 6 months in custody. Mr. Miranda-Espinoza has already served nearly a month more than his maximum possible sentence under the statute. There is therefore no way to give him a sentence to additional custody time, even if he loses the misdemeanor bench trial. To keep him in custody longer without releasing him on bond would be a miscarriage of justice. *Cf. Williams v. Illinois*, 399 U.S. 235, 241–42 (1970) ("[O]nce the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency.").

## III. Because of the Coronavirus crisis, Mr. Miranda-Espinoza is unable to have a bench trial in the near future

On March 17, undersigned defense counsel requested via e-mail for the soonest possible date for a bench trial before this Court. Defense counsel was informed that, because of Order of the Chief Judge No. 18 and the coronavirus crisis, no normal criminal calendars will be held until April 16, 2020 at the earliest.

Defense counsel has also been informed by the management team in his office that there is a strong likelihood that this period will be extended beyond April 16 for an as-yet-undetermined period of time. Because the Court cannot provide Mr. Miranda-Espinoza with a bench trial in the near future, he is in a situation where he must either remain in custody for several months or plead guilty involuntarily to this misdemeanor charge because that is the only way for him to be released.

### IV. Reducing the population at local detention facilities is a public health priority.

Mr. Miranda-Espinoza should also be released on bond as soon as possible in order to help reduce the population at MCC, the detention facility where he is being held, and to reduce his risk of exposure to the coronavirus. "[T]he government's suggestion that [Mr. Miranda-Espinoza] should wait until there is a confirmed outbreak of COVID-19 . . . is impractical." *In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, *1 (N.D.Ca. March 19, 2020). "By then it may be too late." *Id.*

COVID-19 does not respect security measures at jails. The virus has already infiltrated the federal detention system. On March 19, a BOP staffer in New Hampshire tested positive for the virus.[1] On March 20, a pretrial detainee at MDC Brooklyn tested positive for the virus, days after a New York federal prosecutor confidently informed the court that no inmates at any federal facility had tested positive.[2] These positive tests are not an indictment of the facilities' efforts; they

---

[1] Cassidy McDonald, *Workers at federal prisons sound the alarm as system confirms two coronavirus cases*, CBS News (Mar. 19, 2020), available at https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-18/.

[2] Compare Kevin Johnson, *Trump weighs release of some federal prisoners after inmate tests positive for* coronavirus, USA Today (March 22, 2020), available at https://www.usatoday.com/story/news/politics/2020/03/22/first-federal-inmate-tests-positive-coronavirus-new-york/2893959001/ *with* Andrew Denny, *No coronavirus cases at federal prisons, Brooklyn prosecutor says*, New York Post (March 17, 2020), available at https://nypost.com/2020/03/17/no-coronavirus-

are an early indication of the reality that prisons and jails—no different than the rest of the world—will suffer from this pandemic. With hundreds of staffers and service providers entering and exiting the facilities each day, jails are not and cannot be sealed off from the coronavirus.

The inevitable spread of the virus into our local jails will add to the public health crisis already gripping our community. "With no known effective treatment, and vaccines months (or more) away, public health officials have been left to urge the public to practice 'social distancing,' frequent (and thorough) hand washing, and avoidance of close contact with others (in increasingly more restrictive terms)—all of which are extremely difficult to implement in a detention facility." *United States v. Martin*, 2020 WL 1274857, *2 (D. Md., March 17, 2020). That means that when the virus gets in, it will spread quickly.

As contagious as COVID-19 is in daily life in the community, the coronavirus is significantly *more* likely to spread in detention facilities than outside of them. In the community, scientists estimate that one person with COVID-19 will infect about two and a half people without social distancing, and about one person with strong social distancing and quarantining.[3] By contrast, scientists estimate that, in confined settings like prisons and cruise ships, one person with COVID-19 will infect about 11 people, who in turn will infect up to 11 other people each.[4]

That is because conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[5] Prisons and jails "have

---

cases-at-federal-prisons-brooklyn-prosecutor-says/

[3] Adam J. Kucharski *et al.*, *Early dynamics of transmission and control of COVID-19: a mathematical modelling study*, The Lancet Infectious Diseases (2020), available at https://doi.org/10.1016/S1473-3099(20)30144-4.

[4] Kenji Mizumoto & Gerardo Chowell, *Transmission potential of the novel coronavirus (COVID-19) onboard the diamond Princess Cruises Ship, 2020*, 5 Infectious Disease Modelling 264 (2020) (evaluating the transmission rate on a cruise ship, and comparing that infection rate to similarly confined spaces like hospitals, prisons, and churches), available at https://www.sciencedirect.com/science/article/pii/S2468042720300063.

[5] Joseph A. Bick, Infection Control in Jails and Prisons, 45 *Clinical Infectious*

become breeding grounds for infectious epidemics, with severe consequences for both prisoners and the public alike."[6] Outbreaks of the flu regularly occur in American jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[7] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[8]

Across the world, detention facilities have had major coronavirus outbreaks, almost all traced back to jail staff who inadvertently brought the disease in before being diagnosed with the disease. For example, a single prison guard in China showed COVID-19 symptoms in early February; less than three weeks later, 200 prisoners and seven other guards had contracted the disease.[9] Similarly, on March 18, a single officer in the New York City jail on Rikers Island showed symptoms and tested positive for COVID-19; three days later, on March 21, 21 inmates and 17 employees had also tested positive.[10]  Another 58 inmates were under monitoring in quarantine units, but had "likely passed through 'hundreds of housing

---

*Diseases* 1047, 1047–55 (2007), available at https://doi.org/10.1086/521910.

[6] John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News, August 15, 2007, available at https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/.

[7] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge, Mar. 7, 2020, available at https://bit.ly/2TNcNZY.

[8] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," Mar. 2, 2020, available at https://bit.ly/2W9V6oS.

[9] Scott Neuman, *Coroavirus Found in China Prisons, As Cases Spike in South Korea*, NPR (Feb. 21, 2020), available at https://www.npr.org/2020/02/21/808002924/coronavirus-found-in-china-prisons-as-cases-spike-in-south-korea.

[10] NBC New York, *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island: Officials* (Mar. 21, 2020), available at https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/.

areas and common areas over recent weeks and ha[d] been in close contact with many other people in custody and staff.'"[11]

In light of similar threats, prisoners have been released in Iran, Bahrain, and Italy, among other countries, as well as in some American cities.[12]

When detainees in San Diego become ill, the limited medical resources available to the jails will be under-equipped to treat them. Sick detainees will end up adding to the growing number of people competing for scarce hospital beds, ICU rooms, and respirators. In short, keeping hundreds of people in jail together will end up placing a large and disproportionate number of people into an already over-stressed medical system.[13]

But quick action to reduce the population of people in prisons and jails can mitigate the risk and the harm to the community. The Bail Reform Act asks courts to weigh the risk to public safety in making bail and detention determinations. This Court must "take[] this health risk extremely seriously," *see Martin*, 2020 WL 1274857 at *2, when deciding whether release is appropriate. While detention facilities "may successfully have dealt with past viruses and outbreaks of communicable diseases, the pale in scope with the magnitude and speed of transmission of COVID-19." *Id*.

---

[11] *Id.*, quoting the New York City Board of Correction's Interim Chair.

[12] Human Rights Watch, *Human Rights Dimensions of COVID-19 Response* (Mar. 19, 2020), at "Protect people in custody and in institutions," available at https://www.hrw.org/news/2020/03/19/human-rights-dimensions-covid-19-response; Bradford Betz, *Coronavirus leads some overseas prisons to release inmates; Rikers, other U.S. prisons consider the same*, Fox News (Mar. 18, 2020), available at https://www.foxnews.com/world/coronavirus-prisoners-release-inmates-rikers.

[13] *See* Walter Pavlo, *The COVID-19 Prison Crisis Is About To Become A Community Crisis*, Forbes (March 22, 2020), available at https://www.forbes.com/sites/walterpavlo/2020/03/22/the-covid-19-prison-crisis-is-about-to-become-a-community-crisis/

### IV. Mr. Miranda-Espinoza is not a flight risk because of his deep family ties to the community, and because he is fighting to get his residency back

Mr. Miranda-Espinoza has deep ties to the community here that will prevent flight. His entire family is in the United States, including his mother, his siblings, his wife, and his seven children. His mother and four brothers all live in the USA, and are all citizens or permanent residents. His wife of 20 years and seven children are all United States citizens. Several of his children also suffer from significant illnesses that require treatment and support, and the family relies on Mr. Miranda-Espinoza. Defense counsel has been in frequent communication with Mr. Miranda-Espinoza's wife, as well as his other family members. Unfortunately, they do not have the means to serve as sureties for him. However, they can provide him with shelter and support while he is out on bond. In particular, Mr. Miranda-Espinoza has a cousin named Rafael who lives in the San Diego area and could house Mr. Miranda-Espinoza and transport him to court appearances.

Mr. Miranda-Espinoza became a legal permanent resident in 1997, and has lived in the United States for more than twenty years. An immigration court removed Mr. Miranda-Espinoza's permanent residency in 2016. Defense counsel has now successfully challenged the validity of that deportation order in this case. *See* Dkt. 15 (motion to dismiss under 1326(d)); Dkt. 24 & 27 (dismissing indictment). Mr. Miranda-Espinoza is in the process of reopening his immigration proceedings and seeking to restore his status as a lawful permanent resident. For that purpose, he has hired a San Diego-based immigration attorney, Saman Nasseri, and defense counsel has been in frequent contact with Mr. Nasseri concerning how to coordinate Mr. Miranda-Espinoza's criminal and immigration representation. Because he is seeking relief in the immigration courts, and has a realistic possibility of receiving that relief, Mr. Miranda-Espinoza has every possible incentive to return to court in this case and avoid a warrant.

For these reasons, the defense requests a $10,000 bond secured by the

1  defendant's own signature.

                                    Respectfully submitted,

Dated: March 24, 2020               *s/ Eric S. Fish*
                                    Federal Defenders of San Diego, Inc.
                                    Attorneys for Defendant
                                    Email: Eric_Fish@fd.org

**CERTIFICATE OF SERVICE**

Counsel for the Defendant certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Assigned Assistant U.S. Attorney

Respectfully submitted,

Dated: March 24, 2020        *s/ Eric S. Fish*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
Email: Eric_Fish@fd.org